[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court are the motions for summary judgment of defendants Perma-Pipe, Inc. and Commercial Union Insurance Company[1] pursuant to Superior Court Rule of Civil Procedure 56.
 FACTS/TRAVEL
R.I. Gen. Laws § 37-14-3 authorizes the Rhode Island Public Buildings Authority (PBA) to acquire and construct public facilities and to lease the same or any part thereof to the state of Rhode Island.[2] Pursuant to these statutory powers, PBA, upon the governor's June 20, 1985 request, voted to provide for the acquisition, construction, and installation of a medium security adult correctional institution in Cranston, Rhode Island. PBA would lease this facility to the state, and the Rhode Island Department of Corrections (DOC), a plaintiff in this matter, would occupy the facility. DOC, by statute, constitutes part of the executive branch of the state government. See G.L. 1956 § 42-56-2.
Accordingly, PBA entered into a Lease and Agreement (Lease) with the state on November 1, 1985. Section 3.1 of the Lease, entitled "Acquisition, Construction, and Installation," states:
 "The Authority shall be responsible for the letting of contracts for the Project, supervision of construction, preparation and implementation of change orders, acceptance of the completed Project or parts thereof, and all other matters incidental to the performance of the duties and powers expressly granted herein to the Authority in connection with the Project."[3]
Lease Section 3.5, designated "Default in Contractors' Performance," further provides in pertinent part:
 "In the event of default of any Contractor or Subcontractor under any contract made in connection with the Project, the Authority will promptly proceed, either separately or in conjunction with others or by or through the Contractor in the case of default by subcontractors, to exhaust the remedies of the Authority against the Contractor or Subcontractor so in default. . . ."
This Section also states that,
 "[t]he Authority agrees to advise the Authorized State Representative, in writing, of the steps it intends to take in connection with any such default. If the Authority shall so notify the Authorized State Representative, the Authority may in good faith prosecute or defend any action or proceeding or take other action involving any such Contractor, Subcontractor or surety which the Authority deems necessary."[4]
In order to construct the facility, PBA and Marshall Contractors, Inc. (Marshall)[5] entered into a Construction Management Agreement (CMA) dated November 2, 1987. Pursuant to the CMA, Marshall hired subcontractors to supply labor and materials. On February 13, 1990, Marshall contracted with the Bookbinder Company, Inc. (Bookbinder) for the performance of plumbing and HVAC work at the facility, which included the installation of piping for an underground water system.[6]
Bookbinder, in turn, contracted with Perma-Pipe, Inc. (Perma-Pipe) for the supply of materials, including "all underground steam, hot water and chilled water pipe." In addition, Perma-Pipe agreed to provide Bookbinder with a factory trained representative who was technically qualified to determine whether the installation complied with the manufacturer's recommendations and to be present during critical periods of the installation and tests of the system. Furthermore, upon completion of the installation, Perma-Pipe would give Bookbinder a notarized certificate stating that the installation conformed with the manufacturer's recommendations.
Aetna Casualty and Surety Company (Aetna) served as surety for the faithful performance of Marshall's obligations concerning the facility. Furthermore, Commercial Union Insurance Company (Commercial)[7] issued a performance bond in the amount of $5,661,000, covering Bookbinder's construction work and naming PBA and Marshall as obligees. Finally, Atlantic Mutual Insurance Company (Atlantic) issued a policy of liability insurance to Bookbinder.
During 1990, Bookbinder installed a Perma-Pipe water system at the facility. On or about January 17, 1991, Perma-Pipe sent Bookbinder a "Letter of Certification," stating that "the method of installation and testing employed by . . . [Bookbinder] was in accordance with industry standards and . . . [Perma-Pipe's] recommendations." Certification Letter at 1.
DOC began occupying the facility on or about November 5, 1990. In 1991, however, the chilled water system failed and the underground hot water supply and return system leaked. Moreover, during the period of September of 1992 through February of 1994, sporadic leaks and failures of the hot and chilled water system occurred. For example, the hot water supply and return system experienced a minor leak in 1994. To determine why the water system was experiencing failures, PBA, Marshall, and various subcontractors hired experts. The parties, however, dispute the cause of the water system problems. Proffered explanations include defective system design, negligent installation, and DOC's misuse of the system by introducing water exceeding the maximum temperature design capacity.
In December of 1994 and January of 1995, PBA held meetings with Marshall, subcontractors, the sureties, engineers, and architects to discuss how to address the water system's problems and to determine each party's role in reaching a solution. DOC representatives attended several of PBA's public meetings, during which the parties discussed the water system's failure and contemplated repair work to the underground chilled water supply and return system.
On September 19, 1995, PBA entered into a Settlement Agreement with Marshall, Perma-Pipe, and Commercial. According to this agreement, PBA released and discharged Marshall, Perma-Pipe, Commercial, and Bookbinder as well as its insurers,
 "of and from any and all claims of any kind or nature, past, present and future, relating to or in any way connected with or arising from work performed in the original construction of the Project including, but not limited to, the original installation of the hot and chilled water system and any and all other work performed for, by or on behalf of . . . [Commercial, Marshall, and Perma-Pipe] or any one of them by any other person or entity." Settlement Agreement at 2.
In addition to the Settlement Agreement, PBA and Marshall also executed a Repair Contract on September 19, 1995, wherein Marshall agreed to replace a portion of the chilled water supply and return piping system and Commercial agreed to pay Marshall for the repair work. Repair Contract at 2. In furtherance of the repairs, Perma-Pipe would supply pipe at a discounted rate and Marshall would pay Perma-Pipe for the pipe. This repair work corrected the problem with the chilled water system.[8]
In August of 1998, however, the hot water system failed. An expert retained by DOC concluded that poor workmanship and improper installation caused the failure.
On September 14, 1999, DOC and RBA (Plaintiffs) filed this suit. DOC alleges that it spent approximately $1.5 million to fix the hot water system. In their Corrected Amended Complaint, Plaintiffs assert the following claims: breach of contract and breach of express warranty against ADP Marshall and Aetna (Count I); breach of contract and breach of implied warranty against ADP Marshall and Aetna (Count II); negligence against ADP Marshall (Count III); indemnification against ADP Marshall and Aetna (Count IV); breach of contract and breach of implied warranty against Perma-Pipe (Count V); negligence against Perma-Pipe (Count VI); breach of contract and breach of implied warranty against Bookbinder, John Doe I, John Doe II, and Commercial (Count VII); negligence against Bookbinder, John Doe III, and John Doe IV (Count VIII); action against Liberty Mutual Insurance Company (Count IX); and action against Atlantic (Count X).
On November 6, 2001, Defendants argued the following motions before Judge Ragosta of this Court: Bookbinder and Atlantic's motion for summary judgment against Plaintiffs as to Counts VI, VII, and X; Perma-Pipe's motion for summary judgment against RBA as to Counts V and VI; and Perma-Pipe's Rule 12(b)(6) motion to dismiss against DOC as to Counts V and VI. The Court granted Bookbinder's motion for summary judgment against Plaintiffs. It denied Atlantic's motion for summary judgment against DOC, but granted it against RBA. Finally, the Court granted Perma-Pipe's motion for summary judgment against RBA, but denied Perma-Pipe's 12(b)(6) motion against DOC. Plaintiffs settled their claims against Aetna on November 27, 2002.
Now before this Court are Perma-Pipe's motion for summary judgment against DOC as to Counts V and VI and Commercial's motion for summary judgment against Plaintiffs as to Count VII.
 STANDARD OF REVIEW
In a summary judgment proceeding, the moving party must demonstrate that he or she is entitled to judgment as a matter of law and that no genuine issues of material fact exist.Palmisciano v. Burrillville Racing Ass'n, 603 A.2d 317, 320
(R.I. 1992); Super. R. Civ. P. Rule 56(c). During such a proceeding, "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Palmisciano, 603 A.2d at 320. Moreover, "the trial justice must look for factual issues, not determine them" as the judge's sole function is to determine whether any issues involving material fact exist. Steinberg v. State,427 A.2d 338, 340 (R.I. 1981).
"When an examination of pleadings, affidavits, admissions, answers to interrogatories and other similar matters, viewed in a light most favorable to the party opposing the motion, reveals no such issue, the suit is ripe for summary judgment." IndustrialNat'l Bank v. Peloso, 121 R.I. 305, 307, 397 A.2d 1312, 1313
(R.I. 1979). In opposing the summary judgment motion, the nonmoving party will not be allowed to rely upon mere allegations or denials in his or her pleadings. Bourg v. Bristol Boat Co.,705 A.2d 969, 971 (R.I. 1998); Super. R. Civ. P. 56(e). Instead, by affidavits or otherwise, the nonmoving party possesses an affirmative duty to set forth specific facts demonstrating the existence of a genuine issue of material fact. Id. It is not, however, an absolute requirement that the nonmoving party file an affidavit in opposition to the motion. Steinberg,427 A.2d at 340. Rather, if the moving party's affidavit does not establish the absence of a material factual issue, the trial justice should deny the motion despite the nonmoving party's failure to file a counter-affidavit. Id.
 PERMA-PIPE'S MOTION FOR SUMMARY JUDGMENT
I. Binding Effect of the Settlement Agreement on DOC
Perma-Pipe petitions this court to grant summary judgment against DOC as to Counts V and VI on the grounds that DOC is bound by the Settlement Agreement because PBA had actual authority, expressed in the Lease, to act on DOC's behalf in settling contractor defaults. DOC, however, asserts that it is not bound by the Settlement Agreement.[9]
Agency consists of "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Lawrence v. Anheuser-Busch,Inc., 523 A.2d 864, 867 (R.I. 1987) (quoting Restatement (Second) Agency § 1(1)). An agency relationship, therefore, requires the following three elements: "(1) a manifestation by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) an agreement between the parties that the principal will be in control of the undertaking." Id. (citing Restatement (Second) Agency § 1(1) at cmt. b). Furthermore, "[i]t is essential to the relationship that the principal have the right to control the work of the agent, and that the agent act primarily for the benefit of the principal." Id.
The agent's authority comprises "the very essence of the principal and agent relationship." 3 Am. Jur.2d Agency § 68 (2002). Authority constitutes "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) Agency § 7 (1958). Two basic types of authority exist: actual authority and apparent authority. 3 Am.Jur.2d Agency § 68 (2002). Actual authority, which may be express or implied, "is such as a principal intentionally confers upon the agent, or intentionally or by want of ordinary care allows the agent to believe himself or herself to possess." Id.
at § 70. See also Restatement (Second) Agency § 26 (1958) (stating that actual authority results from "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account"). Express actual authority exists where "the principal sought to be charged has, orally or in writing, delegated authority to another by words which authorize such other to do a certain act or series of acts." 3 Am. Jur.2d Agency § 70 (2002). Furthermore, "the manifestations to the agent can be made by the principal directly, or by any means intended to cause the agent to believe that he is authorized or which the principal should realize will cause such belief." Restatement (Second) Agency § 26, at cmt. b (1958).
Applying the three-pronged test articulated in Lawrence, this Court finds that an agency relationship existed between PBA, as agent, and the state, as principal. The state, in turn, includes DOC.[10] Specifically, Lease Sections 3.1 and 3.5 manifest the state's intention that PBA act on its behalf. Section 3.1 of the Lease, which was executed by and between the state and PBA, states that,
 "[t]he Authority shall be responsible for the letting of contracts for the Project, supervision of construction, preparation and implementation of change orders, acceptance of the completed Project or parts thereof, and all other matters incidental to the performance of the duties and powers expressly granted . . . [in the Lease] to the Authority in connection with the Project." (Emphasis added.)
Section 3.5, moreover, dictates that PBA act on the state's behalf in settling defaults. To this effect, it states that "[i]n the event of default of any Contractor or Subcontractor under any contract made in connection with the Project, the Authority willpromptly proceed . . . to exhaust the remedies of the Authority against the Contractor or Subcontractor so in default. . . ."Lease § 3.5 (emphasis added). PBA accepted the undertaking, as is required by the second prong of the test, when it entered into the Settlement Agreement on the state's behalf. Finally, there existed an agreement between PBA and the state that the state would control the undertaking. Evidence of the state's control can be found in Lease Section 3.5, which requires that the Authority advise the Authorized State Representative of the steps it intends to take in connection with any default. Only after so advising the Authorized State Representative, may PBA proceed.See Lease § 3.5 (stating that "[i]f the Authority shall sonotify the Authorized State Representative, the Authority may
in good faith prosecute or defend any action or proceeding or take other action involving any such Contractor, Subcontractor or surety which the Authority deems necessary" (emphasis added)).
This Court further determines that PBA possessed express actual authority to bind the state to the Settlement Agreement. The state intentionally conferred upon PBA, in writing, the duty to settle contractor defaults, as expressed in Lease Section 3.5. Furthermore, in Lease Section 3.1, the state conferred upon PBA the authority to perform all matters incidental to the performance of the duties and powers granted PBA in the Lease. Construed together, Sections 3.5 and 3.1 provide PBA with the authority to perform all matters incidental to its duty to exhaust remedies in the case of a default. This Court finds that such incidental matters include the signing of the Settlement Agreement. Concluding that DOC is therefore bound by the Settlement Agreement because PBA possessed express actual authority to enter into the Settlement Agreement on the state's behalf, this Court grants Perma-Pipe's motion for summary judgment against DOC as to Counts V and VI.[11]
In opposition to Perma-Pipe's motion for summary judgment, DOC argues that Judge Ragosta, in denying Atlantic's motion for summary judgment against DOC, ruled that the Settlement Agreement does not bind DOC. Insofar as DOC's interpretation of Judge Ragosta's ruling would appear to be dispositive of the information before Judge Ragosta, the law of the case doctrine would ordinarily preclude this Court's further examination.[12] However, a review of the transcript reveals that the Settlement Agreement as it relates to DOC's claim against Atlantic was not called to Judge Ragosta's attention prior to his ruling.[13] Additionally, this Court is mindful that Atlantic failed to raise any argument concerning DOC as an incidental third party beneficiary, as Perma-Pipe here does.
Relying on Nelson v. Ptaszek, 505 A.2d 1141, 1143 (R.I. 1986), DOC further asserts that extrinsic evidence of the parties' intent is irrelevant because the Settlement Agreement is unambiguous, and therefore, the plain language of the Settlement Agreement governs.[14] This Court, however, finds thatNelson is distinguishable from the case at bar. While the parties in Nelson dispute which claims the plaintiff released, the parties here dispute which parties are subject to the release. See Nelson, 505 A.2d at 1143.
Finally, DOC avers that to argue that PBA and DOC are agents of each other is to nullify the legislative enactment creating PBA and to negate the Lease. Pl.'s Mem. of Law in Opp'n toCommercial's Mot. for Summ. J. at 12-13. To the contrary, this Court finds that the separate creation of two entities is no way inimical to an agency relationship. Moreover, an agency relationship does not negate an agreement between two parties; rather, the Lease evidences the agency relationship that exists between DOC, through the state, and PBA.
II. Absence of a Contract Between DOC and Perma-Pipe, and DOC as an Incidental, not Intended, Third Party Beneficiary
Even if PBA did not possess express actual authority to bind DOC to the Settlement Agreement, this Court would still grant Perma-Pipe's motion for summary judgment as to Count V for breach of contract and breach of implied warranty because no contract existed between Perma-Pipe and DOC, and DOC constitutes only an incidental, and not an intended, third party beneficiary to any contract that Perma-Pipe executed. It has long been established that a contract requires "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." R.I. Five v. Medical Assocs., 668 A.2d 1250 (R.I. 1996). Furthermore, the requirement of consideration persists whether the contract is express or implied. Hayes v. PlantationsSteel Co., 438 A.2d 1091, 1094 (R.I. 1982).
In its Corrected Amended Complaint, Plaintiffs allege that
 "Perma-Pipe had an implied contractual duty and provided an implied contractual warranty to supply and to inspect the piping and related materials used for and in conjunction with the underground hot water supply and return system . . . in a professional and workmanlike manner and in a manner which would produce a fully functional and non-defective underground hot water supply and return system." Corrected Amended Complaint at 8.
Perma-Pipe, however, argues that DOC provided no legal consideration to Perma-Pipe. In its Reply to Perma-Pipe's Request for Admissions, DOC admits that it made no payments and gave no other legal consideration to Perma-Pipe in exchange for the water system or any repairs to the hot water system. DOC, in turn, fails to provide any evidence of consideration to Perma-Pipe. This Court finds that in the absence of consideration, no contract existed between Perma-Pipe and DOC and, therefore, DOC's claims for breach of contract and breach of implied warranty fail.
This Court further finds that DOC cannot recover against Perma-Pipe for breach of contract and breach of implied warranty as an intended third party beneficiary. While Perma-Pipe argues that DOC does not constitute an intended third party beneficiary, DOC alleges that "[t]he certification that the system was installed properly was intended to directly benefit the entity occupying the medium security prison which was the Department of Corrections." Pl.'s Mem. of Law in Opp'n to Perma-Pipe's Mot.for Summ. J. at 5.
The law in Rhode Island is well-settled that "only intended, and not incidental, third party beneficiaries can maintain an action for damages resulting from a breach of a contract between two other contracting parties." Forcier v. Cardello, 173 B.R. 973,984 (D.R.I. 1994); Davis v. New England Pest Control Co.,576 A.2d 1240, 1242 (R.I. 1990); Finch v. R.I. Grocers Ass'n,175 A.2d 177, 184, 93 R.I. 323, 329-30 (1961). "This rule holds true even where the duty imposed by the contract relates to matters which have a direct bearing upon the damages sustained."Forcier, 173 B.R. at 985.
In determining whether a third party beneficiary is intended or incidental, the Rhode Island courts apply the test set forth in Section 302 of the Restatement (Second) of Contracts, which states:
 "(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
 (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
 (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the intended performance.
 (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."
In essence, the Restatement test requires that "the parties directly and unequivocally intend to benefit a third party in order for that third party to be considered an intended beneficiary." Forcier, 173 B.R. at 985. Therefore, "[t]he intent to benefit the third party must be clearly expressed in the contract." Id. (citing Blu-J. Inc. v. Kemper C.P.A.Group, 916 F.2d 637, 640 (11th Cir. 1990)). Furthermore, a "promissor's mere awareness that someone other than the promisee may derive a benefit from the promissor's performance under the contract is insufficient to cloak that third party with the mantle of intended beneficiary." Id. at 986.
A presumption exists that parties contract for their own benefit and not for the benefit of a third party "unless the parties to a contract explicitly state otherwise, or absent circumstances which clearly indicate that performance under the contract is for the benefit of a third party." Id. at 985. Moreover, "[w]hen a third party seeks enforcement of a contract made between other parties, the contract must be construed strictly against the party seeking enforcement." Id. at 986.
This Court finds that DOC does not constitute an intended third party beneficiary of any contract that Perma-Pipe executed. Perma-Pipe's "Terms and Conditions of Sale" make no mention of DOC. Moreover, in the section entitled "Warranty," the document states that "[s]eller warrants to the original buyer," mentioning no other parties. Perma-Pipe's Certification Letter, which is addressed to Bookbinder, likewise makes no reference to DOC. Accordingly, this Court finds that no contract executed by Perma-Pipe contains any clear expression of an intention to benefit DOC. DOC, therefore, cannot maintain an action as an intended third party beneficiary for breach of contract or breach of implied warranty against Perma-Pipe.[15]
 COMMERCIAL'S MOTION FOR SUMMARY JUDGMENT
I. Binding Effect of the Settlement Agreement on DOC and RBA
Commercial moves this Court to grant summary judgment as to Plaintiffs' breach of contract and implied warranty claims, arguing that DOC is bound by the Settlement Agreement because "PBA when acting for the State was also acting for DOC, which is the same entity as the State." Commercial's Mem. of Law in Supp.of its Mot. for Summ. J. at 11. Commercial further asserts that the Settlement Agreement binds RBA because, by statute, it assumed all of PBA's rights, duties, and obligations. Id. at 13.
In claiming that PBA, when acting for the State, was also acting for DOC, Commercial, in essence, asserts an agency argument. As stated above, PBA possessed express actual authority to bind the state to the Settlement Agreement. In Sections 3.5 and 3.1 of the Lease, the state intentionally conferred upon PBA authority to perform all matters incidental to its duty to exhaust its remedies in the case of a default. This Court finds that entrance into the Settlement Agreement was a matter incidental to PBA's authority to exhaust its remedies in the case of default. DOC, therefore, is bound by the Settlement Agreement. Consequently, this Court grants Commercial's motion for summary judgment as to DOC's claims for breach of contract and implied warranty.
This Court further finds that RBA is bound by the Settlement Agreement. R.I. Gen. Laws § 35-8.1-8.1 states that "upon the passage of this article there are hereby transferred to the authority all the functions, powers, rights, duties, liabilities, property and resources of the public buildings authority." Predicated on this statutory language, this Court finds that RBA can have no greater rights than PBA and that since PBA relinquished its claims via the Settlement Agreement, RBA cannot now assert these claims. Accordingly, this Court grants Commercial's motion for summary judgment against RBA and, therefore, dismisses RBA's breach of contract and implied warranty claim.
II. DOC as an Incidental, not Intended, Third Party Beneficiary
Even if DOC were not bound by the Settlement Agreement, this Court would still grant Commercial's motion for summary judgment against DOC as DOC does not constitute a third party beneficiary of the performance bond that Commercial issued. Rhode Island law requires courts to strictly construe performance bonds. MarshallContractors, Inc. v. Peerless Ins. Co., 827 F. Supp. 91, 94
(D.R.I. 1993). The performance bond's terms determine the nature and extent of a surety's liability on the bond. Id. at 93-94. Furthermore, "[i]n the absence of ambiguity, the extent of the liability of the surety on a common-law bond is determined solely by the language of the bond." Id. at 94. Therefore, "[c]onstruction by implication, which will extend the surety's liability, is not permissible in such a case." Id. Distinct from an insurance policy, "a performance bond is not intended to compensate for indirect losses or to indemnify against liability to others." Id. at 95.
A strict construction of the performance bond executed by Commercial reveals that DOC is not an intended beneficiary of the same. This Court finds that the performance bond is unambiguous on its face. As no ambiguity exists, this Court must determine the extent of Commercial's liability on the bond solely by the language of the bond. The bond names as obligees only Marshall and PBA. The bond does not name DOC as an obligee, nor does it reference DOC at all. To construe DOC as part of the bond by implication would be to extend the surety's liability in contravention of law.
 CONCLUSION
This Court grants Perma-Pipe's motion for summary judgment against DOC, dismissing DOC's breach of contract, breach of implied warranty, and negligence claims. This Court likewise grants Commercial's motion for summary judgment as to DOC's and RBA's claims for breach of contract and breach of implied warranty. Perma-Pipe and Commercial shall present an appropriate order and judgment for entry.
[1] Also named as defendants in this action are the Bookbinder Company, Inc.; Atlantic Mutual Insurance Company; ADP Marshall, Inc.; the Aetna Casualty and Surety Company; John Doe I and John Doe II on behalf of the Bookbinder Company, Inc.; and Liberty Mutual Insurance Company.
[2] PBA ceased to exist in 1997. The Rhode Island Refunding Bond Authority (RBA), a plaintiff in this matter, succeeded PBA.
[3] The "Authority," as defined by the Lease, consists of PBA.Lease at 2.
[4] "Authorized State Representative," as defined by the Lease, consists of "the Director of the Department of Administration or his designee." Lease at 2.
[5] Defendant ADP Marshall, Inc. (ADP Marshall) is the successor-by-merger to Marshall.
[6] At some point subsequent to this contract but before Plaintiffs filed this suit, Bookbinder filed for bankruptcy.
[7] Commercial is now known as OneBeacon American Insurance Company.
[8] The repairs to the chilled water lines, therefore, are not here at issue.
[9] In support of its position, DOC articulates a number of reasons which it sets forth in its Memorandum in Opposition to Commercial's Motion for Summary Judgment. It incorporates these reasons by reference into its Memorandum in Opposition to Perma-Pipe's Motion for Summary Judgment.
[10] See G.L. 1956 § 42-56-2 (stating that "[t]here is establsihed [sic] within the executive branch of state government a department of corrections").
[11] Finding that, under an agency theory, the Settlement Agreement binds DOC, this Court declines to address Perma-Pipe's additional argument that the Settlement Agreement binds DOC because DOC and PBA are instrumentalities of the same state government.
[12] The law of the case doctrine provides that "after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." Chavers v. Fleet Bank, No. 2002-201, slip op. at 17 (R.I., filed February 11, 2004). The doctrine, however, is "flexible" in that "it may be disregarded when a subsequent ruling can be based on an expanded record." Id. at 18. Additionally, "the doctrine should not be invoked to `perpetuate a clearly erroneous earlier ruling.'" Id.
[13] Specifically, the hearing transcript states as follows:
 "The Court: But you're not asking for summary judgment for Atlantic Mutual against the Department of Corrections?
 Ms. Kelly: I'd like to, your Honor, but a lot of that would depend on how Mr. Whitney does on his 12(b)(6) motion.
 The Court: I think I can dispose of that right away, motion denied, summary judgment against — they're the surety for Bookbinder and it's been substituted in the case, it's been brought by the Department of Corrections against these parties, not by the Rhode Island Public Building Authority because we've dismissed those cases or we've granted summary judgment.
. . . .
 The Court: . . . Atlantic Mutual is also for Bookbinder on liability so they're going to stay in the case.
. . .
 Ms. Papazian-Ross: Judge, I have to clarify something. Is Atlantic Mutual moving for Summary Judgment on the releases against the Department of Corrections?
 Ms. Kelly: No. My understanding was that the releases as to the department — as to the Department of Corrections the Motion for Summary Judgment was denied by the Judge.
 The Court: Correct. I just granted it as to Bookbinder because it went into Chapter 7, but Atlantic has been substituted technically both as surety and also substituted when there's bankruptcy." Tr. at 7, 8, 33.
[14] In so arguing, DOC emphasizes that it is not named in the Settlement Agreement and that it did not sign the same. In addition, DOC directs this Court's attention to the Settlement Agreement provision stating that "[t]his Agreement is entered into solely for the benefit of the parties hereto and is not intended to benefit any third person, entity or organization not a party to this Agreement." Settlement Agreement at 3.
[15] Having found that the Settlement Agreement binds DOC and that DOC does not constitute an intended third party beneficiary to any contract that Perma-Pipe executed, this Court declines to rule on Perma-Pipe's arguments concerning equitable estoppel, Perma-Pipe's disclaimer of implied warranties, the statute of limitations, the economic damages doctrine, and DOC's alleged failure to prove damages.